FILED: **9/22/10**
U.S. DISTRICT COURT
EASTERN DISTRICT COURT
DAVID J. MALAND, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION
---------------------------------------------------------------X

UNITED STATES OF AMERICA
*el rel.* MELESSA PONZIO and
SHARON CLUBB,

                        Plaintiffs,

                 v.

RABINTEX INDUSTRIES LTD.,
TENCATE ADVANCED ARMOR USA INC.
d/b/a COMPOSIX,
RABINTEX USA LLC., RABINTEX USA INC.,
OHIO ARMOR, LLC., ARMORSOURCE LLC,
LAWRENCE J. DICKSON, DONALD L. BLAKE,
YOAV KAPAH, SHACHAR BERNHARD,
PAUL A. GARCIA, HUMBURTO DELEON
PAUL HOWELL, TROY MILLER,
MARK TURNER, BRAD BEUS,
RICK CARTER, HECTOR GONZALEZ,
GARY VANN, ARMANDO POLOMO,
REGGIE WRIGHT, RICHARD POWELL,
TONEY BEVERLY and JEFFREY COTTON,
and JOHN DOES # 1-5

                        Defendants.
---------------------------------------------------------------X

Civil Case No.   1:10cv588

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. §3730

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

## VERIFIED COMPLAINT FOR VIOLATION
## OF THE FEDERAL FALSE CLAIMS ACT

      Plaintiff-Relators Melessa Ponzio and Sharon Clubb for their Complaint against the

defendants, allege upon information and belief as follows:

## I.    **Introduction**

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records and claims made and caused to be made by the defendants and/or their agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §3729 et seq., as amended ("the FCA" or "the Act").

2.      This *qui tam* case is brought against several related military defense contractors and their principals, all of whom are highly sophisticated, and who knowingly defrauded the U.S. Treasury of sums equaling or exceeding twenty-six million ($26,000,000.00) dollars.

3.      Through the defendant entities including, but not limited to, RABINTEX USA LLC and ARMORSOURCE LLC, the defendants entered several military defense contracts with the U.S. Department of Defense ("the DOD").

4.      Under those contracts, the defendants contracted to manufacture and provide the Department of Defense with *Kevlar* armored combat helmets.

5.      Upon securing such contracts with the DOD, the defendants proceeded to manufacture, and provided to the DOD in excess of 100,000 combat helmets, virtually all of which were defective, and were known to be defective by the defendants.

6.      In manufacturing such defective helmets, the defendants:

        (a)     affirmatively directed their employees and/or agents to use substandard and defective materials in making the helmets;

        (b)     affirmatively directed their employees and/or agents to use prohibited manufacturing procedures in making such helmets;

     (c)     implemented affirmative practices to affirmatively conceal the fact that the helmets were defective from the Department of Defense; and

     (d)     submitted and caused to be submitted false certifications to fraudulently induce the DOD to pay them for the purchase of such defective helmets.

7.     The Plaintiffs/Relators are supervisors employed within the facility within which the helmets were manufactured. At no time did the job duties of the Plaintiffs/Relators include the investigation and/or reporting of fraud.

8.     Upon personally observing the activities described within paragraph "6" herein above, the Relators submitted objections to their supervisors, complaining not only that the defendants were manufacturing defective helmets and knowingly selling them to the Department of Defense, but that the defendants had undertaken affirmative actions to deliberately mislead the DOD and to conceal their actions.

9.     The Relators' superiors refused to act upon their objections, or to take any action to stop the fraudulent practices described herein.

10.     Faced with such refusals, the Relators voluntarily filed complaints with the Office of the Inspector General for the United States Department of Justice (the "OIG"), and they voluntarily provided the OIG with thousands of pages of company records which substantiated the defendants' fraudulent conduct described herein.

11.     Upon confirming the Relators' claims, the OIG triggered a "global recall" of the more than 100,000 helmets which the defendants had sold to the DOD.

12.     Notwithstanding the fact that the defendants knew that the helmets they were selling to the DOD were defective, they caused their employees and/or agents to create and provide with each shipment of helmets a false certification indicating that the helmets were free

of such defects and were manufactured in accord with permitted manufacturing processes.

13.    Through the submission of such false certifications, the defendants fraudulently induced the DOD to pay them monies exceeding twenty-six million dollars ($26,000,000.00) for the purchase of such defective helmets, all of which have been recalled.

14.    As a result of the defendants fraudulent and deceptive conduct, including their submission of false and fraudulent statements and claims, the U.S. Treasury has suffered not less than twenty-six million dollars ($26,000,000.00) in damages.

15.    The False Claims Act was originally enacted during the Civil War, for the purpose of being employed as the primary tool to fight fraud perpetrated against the U.S. Government by military defense contractors.

16.    In 1986, Congress amended the Act intending to create increased incentives for individuals with knowledge of such fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the governments' behalf.

17.    The Act allows any person having information about false or fraudulent claims to bring an action for himself and the U.S. Government, and to share in any recovery.

18.    The Act requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time).

19.    Based upon these provisions, the *qui tam* Relators seek through this action to recover damages and civil penalties arising from the defendants' scheme to defraud the federal government as further described herein below.

## II.   THE PARTIES

20.    Plaintiff/Relator MELESSA PONZIO  (hereinafter "Ms. Ponzio") is an individual residing in Beaumont Texas.

21.    At all relevant times described herein, Ms. Ponzio was employed by Federal Prison Industries Inc, as a plastics worker supervisor, with an actual place of employment at 5830 Knauth Road, Beaumont Texas, 77705.

22.    Plaintiff/Relator SHARON CLUBB (hereinafter "Ms. Clubb") is an individual residing in Beaumont Texas.

23.    At all relevant times described herein, Ms. Clubb was employed by the Federal Prison Industries Inc., as a plastics worker supervisor, with an actual place of employment at 5830 Knauth Road, Beaumont Texas, 77705.

24.    Upon information and belief, defendant RABINTEX INDUSTRIES LTD. (hereinafter "Rabintex Industries") is a foreign corporation, which maintains a principal place of business at 8 Hamanofim St, Ofeq House, Herzliya, Israel 46725.

25.    Upon information and belief, defendant  TENCATE ADVANCED ARMOR USA INC. d/b/a COMPOSIX (hereinafter "Composix") is corporation organized under the laws of Ohio, which maintains an actual place of business at 23 Sisal Street, Newark OH 43055-5831.

26.    Upon information and belief, defendant RABINTEX USA LLC is a Limited Liability Company which maintains a principal place of business at 23 Sisal Street, Newark OH 43055-5831.

27.     Upon information and belief, defendant Rabintex USA LLC is a jointly owned subsidiary of Rabintex Industries and Composix, which is controlled by Rabintex Industries and Composix.

28.     Upon information and belief, defendant RABINTEX USA INC. is a corporation organized under the laws of the State of Delaware which maintains a principal place of business at 23 Sisal Street, Newark OH 43055-5831.

29.     Upon information and belief, defendant Rabintex USA INC. is a jointly owned subsidiary of Rabintex Industries and Composix, which is controlled by Rabintex Industries and Composix.

30.     Upon information and belief, defendant OHIO ARMOR LLC (hereinafter "Ohio Armor") is a Limited Liability Company organized under the laws of the State of Ohio, which maintains a principal place of business located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

31.     Upon information and belief, defendant ARMORSOURCE LLC (hereinafter "Armorsource") is a Limited Liability Company organized under the laws of the State of Delaware, which maintains a principal place of business located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

32.     Upon information and belief, defendant Armorsource is, or at relevant times was, a jointly owned subsidiary, which was jointly owned and controlled by and between defendants Rabintex Industries, Rabintex USA LLC, Rabintex USA INC., Composix and Ohio Armor.

33.    Pleading in the alternative, upon information and belief, Armorsource is a successor in interest to Rabintex USA LLC and/or Rabintex Inc., which is, or at relevant times was, owned by defendants Rabintex Industries, Rabintex USA LLC, Rabintex USA INC., Composix and Ohio Armor.

34.    Upon information and belief, defendant LAWRENCE J. DICKSON  is an individual whose actual place of business or employment is located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

35.    At all relevant times described herein, defendant Lawrence Dickson was a principal, the Chief Operating Officer (CEO) and controlling member, of Ohio Armor.

36.    Defendant DONALD L. BLAKE is an individual whose actual place of business or employment is located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

37.    At all relevant times described herein, defendant Donald Blake was a principal and controlling member of Ohio Armor.

38.    Defendant YOAV KAPAH  is an individual whose actual place of business and/or employment is located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

39.    At all relevant times described herein, defendant Yoav Kapah was a principal, a controlling member, and the President, of Armorsource.

40.    Defendant SHACHAR BERNHARD is an individual whose actual place of business and/or employment is located at 3600 Hebron Road, Hebron Ohio, 43025-0030.

41.    At all relevant times described herein, defendant Shachar Bernhard was a principal, a controlling member, and Vice President of Sales of ArmorSource.

42.     Upon information and belief, defendant PAUL A. GARCIA is an individual whose actual place of business and/or employment is 223 Sisal St. Newark, OH 43055.

43.     At all relevant times described herein, Mr. Garcia was employed by defendant Rabintex USA LLC as ACH Program Manager.

44.     Upon information and belief, defendant HUMBURTO DELEON  is an individual whose actual place of business and/or employment is 223 Sisal St. Newark, OH 43055.

45.     At all relevant times described herein, Mr. Deleon was employed by defendant Rabintex USA LLC as ACH Production Project Manager.

46.     Defendant PAUL HOWELL is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

47.     At relevant times described herein, defendant Howell was employed by the Federal Prison Industries Inc. as an Assistant Factory Manager, managing a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

48.     At additional relevant times described herein, defendant Howell retired from his employment from Federal Prison Industries Inc., but immediately thereafter, resumed managing the factory situated at 5830 Knauth Road, Beaumont Texas, 77705, as an employee of defendant Armorsource.

49.     Defendant TROY MILLER is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

50.     At relevant times described herein, defendant Miller was employed by Federal Prison Industries Inc. as a Superintendent of Industries, within a factory situated at 5830 Knauth

Road, Beaumont Texas, 77705.

51.     Defendant MARK TURNER is an individual whose actual place of business
and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

52.     At relevant times described herein, defendant Turner was employed by Federal
Prison Industries Inc. as a Production Manager within a factory situated at 5830 Knauth Road,
Beaumont Texas, 77705.

53.     Defendant BRAD BEUS is an individual whose actual place of business and/or
employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

54.     At relevant times described herein, defendant Beus was employed by Federal
Prison Industries Inc. as a General Manager within a factory situated at 5830 Knauth Road,
Beaumont Texas, 77705.

55.     Defendant RICK CARTER is an individual whose actual place of business and/or
employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

56.     At relevant times described herein, defendant Carter was employed by Federal
Prison Industries Inc. as a General Manager within a factory situated at 5830 Knauth Road,
Beaumont Texas, 77705.

57.     Defendant HECTOR GONZALEZ is an individual whose actual place of business
and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

58.     At relevant times described herein, defendant Gonzalez was employed by Federal
Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth
Road, Beaumont Texas, 77705.

59.     Defendant GARY VANN is an individual whose actual place of business and/or

employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

60. At relevant times described herein, defendant Vann was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

61. Defendant ARMANDO POLOMO is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

62. At relevant times described herein, defendant Polomo was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

63. Defendant REGGIE WRIGHT is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

64. At relevant times described herein, defendant Wright was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

65. Defendant RICHARD POWELL is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

66. At relevant times described herein, defendant Powell was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

67. Defendant TONEY BEVERLY is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

68.     At relevant times described herein, defendant Beverly was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

69.     Defendant  JEFFREY COTTON is an individual whose actual place of business and/or employment is located at 5830 Knauth Road, Beaumont Texas, 77705.

70.     At relevant times described herein, defendant Cotton was employed by Federal Prison Industries Inc. as a Plastics Worker Supervisor within a factory situated at 5830 Knauth Road, Beaumont Texas, 77705.

71.     Upon information and belief, defendant JOHN DOES # 1-5 are individuals whose an actual place of business and/or employment is located at 8 Hamanofim St, Ofeq House, Herzliya, Israel 46725.

72.     Upon information and belief, at relevant times described herein defendant John Does # 1-5 were, and/or are, principals, shareholders, directors and or agents and employees of Rabintex Industries LTD.

## III.    JURISDICTION AND VENUE

73.    This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

74.    This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States.

75.    Venue is proper in this District pursuant to 31 U.S.C. 3732(a) because the defendants transacted business within this District, and because the acts proscribed by 31 U.S.C. §3729 occurred within this District.

## IV.    PRELIMINARY BACKGROUND

### A.    *Kevlar* Military Helmets

76.    In the 1970's the U.S. Army completed design and development work on the first in a series of new helmets to replace the M1 "steel pot" that had been in service since World War II.

77.    Rather than steel, the sole armor employed in the manufacture of this new generation of helmets is *Kevlar*, a synthetic aramid fiber.

78.    When employed in the construction of military armor, such as helmets, *Kevlar* threads are woven into a dense fabric in a manner which is specifically designed for ballistic protection.

79.    When *Kevlar* is woven as a cloth and layered, a bullet or other projectile encounters many threads at once. As *Kevlar* does not stretch, when a bullet or other projectile strikes *Kevlar* cloth, the energy is transferred from the threads which are initially struck, to the other threads within the cloth.

80.    The denser the weave (i.e. the more threads per square inch) the more resistance the projectile encounters, and the greater the number of threads available to receive the transfer of energy from the impact of the projectile.

81.    The number of threads woven per inch in either the lengthwise direction (the "*warp*") or the crosswise direction (the "*fill*") of the woven fabric is known as the "thread count."

82.    The Department of Defense has approved the use of *Kevlar* as the primary armor of military helmets for U. S. Soldiers, subject to strict specifications for both the helmets, and the *Kevlar* cloth with which they are constructed.

83.    The *Kevlar* helmets which have been approved by the DOD for military use include the PASGT (Personal Armor System Ground Troops), the ACH (Advanced Combat Helmet) and LCH (Lightweight Combat Helmet).

84.    These *Kevlar* military helmets consist of three major components: (a) an outer shell, (b) an inner shell, and (c)  multiple layers of *Kevlar* shields (or disks) which are sandwiched between the inner and outer shells, in a pre-arranged pattern.

85.    Given the critical function of military helmets, the Department of Defense explicitly requires that *Kevlar* shields meet specifications proscribed to ensure that U.S. Service personal are afforded a sufficient level of ballistic protection.

86.    Toward that end, the DOD has adopted strict military specifications ("mil specs") for both the helmets themselves, and of greater import, the *Kevlar* installed within them.

87.    When employed as helmet armor, multiple shields or disks of *Kevlar* are layered inside the helmet in a prearranged pattern.

88.    Those shields are cut from a cloth, which has been woven to a minimum weave density, or thread count, which has been predetermined by the DOD as being the minimum weave density necessary to afford adequate ballistic protection.

89.    Because weave count, and crossover points (where strands of *Kevlar* cross at right angels) are critical to ballistic protection, DOD specifications explicitly require specific minimum thread counts, per inch for both *warp* and *fill*.

90.    Under the mil specs for each type of helmet, shields or disks are then cut from the *Kevlar* cloth in predetermined patterns.

91.     Sets of these patterns are then installed, in overlapping fashion, into helmets, in accord with DOD specifications which delineate both the required number of shields, and specific layout of how the shields are to be installed within the helmets.

92.     Within its mil specs, the DOD has explicitly identified three specific potential defects in the manufacture of helmets which the DOD has classified as "critical" defects.

93.     Those three critical defects include: (a) if the number of *Kevlar* layers installed is less than the number required under the mil specs, (b) if the composition of the material is not as specified (i.e., the weave density or thread counts are less than the minimums specifically set forth in the mil specs), or (c) if the final configuration of the *Kevlar* shields is not as required by the mil specs.

94.     Significantly, the DOD's mil specs also affirmatively mandate that any DOD contractor who has contracted to supply *Kevlar* helmets to the DOD, must inspect both the *Kevlar*, and the manner within which it has been arranged inside each helmet, for defects and affirmatively requires that any such contractor reject within its manufacturing facility, any fabric or layout which does not meet the required weave, composition or layout specifications.

B.     Rabintex Solicits Helmet Contracts From the DOD

95.     Rabintex Industries LTD.. is an Israeli military defense contractor, which

manufactures personal body armor such as protective vests and helmets, as well as armored

vehicles.

96.     In or about 2004, Rabintex Industries became desirous of bidding upon U.S.

Department of Defense (DOD) contracts for the provision of *Kevlar* armored military helmets.

97.     More specifically, Rabintex Industries was desirous of securing contracts to

manufacture and sell to the U.S. Department of Defense, Rabintex Advanced Combat Helmets

(ACH's).

98.     As a foreign entity based in Israel, Rabintex Industries was ineligible to bid upon

such contracts for the U.S. Military.

99.     To secure access to such U.S. Military contracts, Rabintex Industries secured the

cooperation of Tencate Advanced Armor USA Inc. (hereinafter "Tencate"), which, upon

information and belief, was an Ohio corporation doing business under the name Composix.

100.     Rabintex Industries caused the formation of Rabintex USA Inc., and its apparent

successor, Rabintex USA LLC , as a jointly owned subsidiary of Rabintex Industries and

Tencate, which subsidiary was controlled by Rabintex Industries.

101.     Through Rabintex USA LLC, Rabintex Industries and Tencate pursued and

secured contracts including, but not limited to contract number W911QY-06-D-0006, which was

awarded to them in 2006.

102.    Under contract W911QY-06-D-0006, Rabintex USA was to manufacture and sell more than 100,000 Advanced Combat Helmets to the U.S. Department of Defense, at a purchase price of $250 per helmet, or in excess of twenty-six million dollars ($26,000,000.00).

103.    Upon information and belief, at some point in time unknown to the Relators, defendants Ohio Armor LLC and its principals, Lawrence J. Dickson and Donald L. Blake, acquired an interest in Rabintex USA and/or contract number W911QY-06-D-0006, and the defendants Rabintex Industries, Composix, Rabintex USA LLC, Ohio Armor and their principals began doing business under the name Armorsource LLC, in manufacturing and selling helmets to the DOD under contracts including, but not limited to, contract number W911QY-06-D-0006.

### C.    Unicor

104.    Federal Prison Industries Inc., is a self-sustaining, self-funded corporation which was established by Congress in 1934, and which receives no government funding.

105.    Operating under the name, "Unicor," Federal Prison Industries Inc. is controlled by a Board of Directors headed by a Chairman.

106.    Unicor is engaged in the business of manufacturing products employing federal inmates as laborers, in factories set-up inside federal correctional facilities.

107.    Upon information and belief, in fiscal year 2008, Unicor generated over $854 million in sales, employed over 21,000 inmates in 109 factories producing about 175 different types of goods and services, which included clothing and textiles, electronics, fleet management and vehicular components, industrial products, office furniture and services including recycling activities, data entry and encoding.

108.   When Rabintex USA secured its 2006 contract to manufacture Advanced Combat Helmets, Rabintex USA retained Unicor, as a subcontractor, to physically manufacture the ACH's within a federal prison in Beaumont Texas.

109.   Once the subcontract between Rabintex USA and Unicor was secured, a factory operation was set-up within a federal corrections complex, known as FCC Beaumont Medium, situated at 5830 Knauth Road, Beaumont Texas, 77705 (hereinafter "the Beaumont facility").

110.   Within the Beaumont facility, federal prison inmates began manufacturing ACH's under the direct supervision and control of Rabintex USA.

## V.   Facts Giving Rise to Claims Under the Federal False Claims Act

111.   From the outset of its contract, Rabintex USA LLC, its principals and agents, and the principals and agents of its parent company (hereinafter collectively referred to as "Rabintex") exerted actual control over the manufacture of helmets within the Beaumont facility.

112.   Upon information and belief, the principals and agents of Rabintex who exerted actual supervision and control over the manufacture of helmets within the Beaumont facility included defendants Rabintex Industries, Composix, Rabintex USA INC., Ohio Armor, Armorsource, Lawrence Dickson, Donald Blake, Yoah Kapah, Shachar Bernard, Paul Garcia, Humberto Deleon and Paul Howell, hereinafter collectively referred to as "the Rabintex defendants."

113.   Through such control, the Rabintex defendants, together with other defendants herein, proceeded to deliberately manufacture substandard and defective helmets which were not in compliance with military specifications, employed adulterated materials and substandard

procedures in manufacturing such helmets, and deliberately, affirmatively and systematically provided false and fraudulent information and false statements to the DOD not only to conceal defects in the helmets they were providing, but to fraudulently induce the DOD to pay the defendants more than twenty-six million dollars ($26,000,000.00) for the purchase of such defective helmets.

A.     Rabintex and it Agents Exert Control Over
       Manufacturing at The Beaumont Facility

114.   At the inception of setting up a factory operation in the Beaumont facility to manufacture helmets for the defendants to sell to the DOD, the Rabintex Defendants exerted actual and direct control over the entire manufacturing process, to facilitate a high rate of helmet production within such facility.

115.   More specifically, upon information and belief, during the production of helmets within the facility, the Rabintex Defendants conspired with, and/or exerted actual influence and control over defendants Paul Howell, Troy Miller, Mark Turner, Brad Beus, Rick Carter, Hector Gonzalez, Gary Vann, Armando Polomo, Reggie Wright, Richard Powell, Toney Beverly and Jeffrey Cotton.

116.   Upon information and belief, in conspiring with and/or exercising actual control over the other defendants described immediately herein above the Rabintex Defendants exerted actual control and supervision over the federal inmates who were employed as factory workers in manufacturing at the Beaumont facility, and they controlled the processes by which helmets were manufactured within such facility.

117.    The Rabintex Defendants also exerted supervision, oversight and control by sending two of its own employees to physically remain within the factory as managers.

118.    Those Rabintex employees included defendant Paul A. Garcia, who was employed by Rabintex USA LLC as "ACH Program Manager" and defendant Humberto "Amir" DeLeon, who was employed by Rabintex USA LLC as "ACH Production Project Manager."

119.    At the time that Rabintex secured the first of the helmet contracts described herein, defendant Paul Howell was employed by Federal Prison Industries Inc., as the Assistant Factory Manager of the Beaumont facility.

120.    After Rabintex secured control over operations within the Beaumont facility, however, defendant Howell "retired" from his position with Federal Prison Industries Inc., only to resume management over production of Rabintex's helmets, three days later, **then** as a direct employee of Rabintex.

121.    Acting under the influence of the Rabintex Defendants, each of the defendants whose actual place of business and/or employment is listed herein above as 5830 Knauth Road Beaumont Texas, affirmatively directed and caused the inmates who were physically manufacturing the helmets on the production line, to manufacture them employing defective materials, and prohibited manufacturing practices, as described herein below.

122.    Each of the Beaumont facility defendants prevented quality assurance personnel from rejecting patently defective helmets, collected previously rejected helmets which had been isolated as rejects, and caused them to be shipped and sold to the DOD together with false certifications wherein the defendants falsely certified that the helmets complied with all applicable military specifications.

B.      The Use of Adulterated *Kevlar*

1.      The ACH's (Advanced Combat Helmet)

123.    Under contract W911QY-06-D-0006 Rabintex USA LLC contracted to manufacture and provide to the DOD Advanced Combat Helmets (ACH's) which were to be manufactured in accord with military specifications provided by the DOD.

124.    Those mil specs explicitly required, among other things, that the *Kevlar* to be installed into the ACH's:  (a) was to consist of *Kevlar* shields or disks made of *Kevlar* fabric which was woven at or above the critical minimum weave density which had been set by the DOD's mil specs, (b) was to include the specified number of *Kevlar* disks, which (c) were to be arranged in the specific pattern which was required under the mil specs.

125.    Upon securing its contract to sell ACHs to the DOD, Rabintex retained Unicor as a subcontractor, and arranged to have federal inmates at a Beaumont correctional facility physically assemble the helmets for Rabintex.

126.    At the time that prison inmates at the Beaumont facility began assembling ACH helmets under Rabintex's contract, Rabintex representatives observed inmates beginning the manufacturing process by placing helmet outer shells upside-down, and then placing a set of *Kevlar* disks inside the inverted sell, in the pre-arranged pattern set within the DOD's mil spec.

127.    Rabintex representatives further observed that when the *Kevlar* disks were placed into inverted outer shells, the ends of the *Kevlar* disks protruded above the top of the outer shell, and that repeatedly pushing the ends of the disk back inside the shell, at multiple times in the manufacturing process was not only time consuming, but was slowing down the overall production process for the helmets.

128.     To eliminate this delay, and expedite production, Rabintex representatives caused the inmates to initiate a process they called "cleaning."

129.     Cleaning, in actuality, is a process of adulterating the *Kevlar* shields by physically removing strands of *Kevlar* from the shields so inmates could install them more quickly into the outer helmet shells.

130.     To "clean" sets of disks, each inmate was provided with a block of wood which had one or more screws protruding from it.

131.     They would rake the screws down the edges of the material removing cross-threads of *Kevlar* from each disk both to reduce weight and to increase the speed of production employing the "cleaned" disks.

132.     Once the cross strands of *Kevlar* had been removed from a full set of disks, the set of adulterated disks was then installed into the outer shell of a helmet which then went through the rest of assembly, into final product.

133.     By causing the removal of the cross strands of *Kevlar* with all of the disks, the defendants reduced the weave density of the *Kevlar* below the "critical" minimum weave density required under the DOD's mil specs.

134.     Simultaneously, such removal of cross strands created "unprotected" areas within each helmet, within which a projectile striking the helmet would encounter little, if any, resistance to penetration.

135.     Virtually all ACH helmets produced under the control of Rabintex at the Beaumont facility were "cleaned", and thereby afforded less ballistic protection than what would have been provided had the *Kevlar* not been adulterated by the removal of *Kevlar* strands.

## 2.   The Lightweight Combat Helmets

136.   Upon information and belief, in addition to securing a contract to manufacture and sell Advanced Combat Helmets (ACH's) to the DOD, Rabintex also secured a contract to manufacture and sell Light Weight Marine helmets (LCH's) to the DOD.

137.   Several years before Rabintex had secured that contract to provide LCH helmets to the DOD, Unicor had purchased four million dollars worth of *Kevlar* panels, or "disks" which were designed specifically for use in ACH helmets.

138.   Unicor had purchased such disks in anticipation of securing its own contract to manufacture ACH's.

139.   When Unicor failed to obtain such contract, the *Kevlar* disks it had purchased for ACH helmets were placed into a non-temperature-controlled warehouse for a number of years.

140.   As a result of a defective roof atop the warehouse within which the *Kevlar* had been placed, that *Kevlar* was exposed to the elements inclusive of rain and heat for a number of years.

141.   Upon Rabintex's securing the contract to provide LCH helmets to the DOD, Rabintex again enlisted Unicor's factory, this time to physically manufacture the LCH helmets.

142.     Upon information and belief, the Rabintex defendants conspired with persons controlling Unicor to use the old *Kevlar*, which had been designed for use in ACH's, in the manufacture of the LCH's, despite the fact that they knew that: (a) the disks were neither of the proper design nor the proper weight of *Kevlar* to use in LCH helmets, and (b) the old *Kevlar* was now outdated and wholly defective, with much of it having been openly exposed to outside weather conditions for a period of years.

143.     In furtherance of such conspiracy, the defendants purchased a minimal amount of the proper *Kevlar* for the manufacture of a "first article", *or sample,* LCH which they presented to the DOD.

144.     Based upon that sample provided by the defendants, which included the proper *Kevlar* which the defendants had purchased *only for the sample*, the DOD awarded the full contract for the LCH helmets to Rabintex, and the defendants commenced manufacturing the LCH helmets, but employed the old *Kevlar* disks which were intended for ACH's, in making the LCH helmets.

145.     Much of the old *Kevlar* was in such poor condition, and had become so brittle, that workers in the factory had to pound the *Kevlar* with heavy objects to make it pliable enough to insert the disks into the helmets being manufactured.

146.     Due to the fact that the *Kevlar* disks which were intended for ACH helmets were "too heavy," the defendants simply reduced the weight of the disks by physically cutting them smaller, thereby reducing the physical size of each protective disk inside each helmet.

147.     As a result of making the disks physically smaller, there was less overlap between disks, and/or there were areas within each helmet where there were gaps in *Kevlar* protection.

148. All of this was being carried out under the supervision and control of the Rabintex defendants, who, upon information and belief, caused and/or ratified these actions, for the purpose of pursuing and maintaining the maximum rate of production of helmets for Rabintex to sell to the DOD.

149. Relator Ponzio explicitly asked her superior why the material was being cut in such manner, and she was advised " because the material we are using is overweight."

150. The superior explicitly advised Relator Ponzio that the decision to use the old material was made by defendant Brad Beus.

151. Inside the factory, defendants Troy Miller and Rick Carter were overseeing and directing the cutting of the ACH *Kevlar* disks for installation in LCH helmets.

152. Each and every LCH helmet that was manufactured within the Beaumont facility under the direction and control of the Rabintex defendants, and sold to the DOD by Rabintex, was defective in that it contained defective *Kevlar*, less *Kevlar* than what was required under the applicable military specifications, and afforded less ballistic protection than would have been provided had the *Kevlar* shields not been physically cut down to smaller sizes.

C.    The Use of Defective Paint

153.    In manufacturing and selling ACH helmets to the DOD, Rabintex was required to paint the exterior of each helmet in accord with specifications provided by the DOD.

154.    Acting under the direction and control of the defendants, inmates at the Beaumont facility painted the helmets with paint which, at the time of its employ, was beyond its expiration date.

155.    To record her objection to the defendants deliberate use of expired paint on the helmets, Relator Melessa Ponzio f/k/a Melessa Harryman notified defendant Gary Vann that defendant Troy Miller had directed the staff within the factory to employ the expired paint. A true copy of her e-mail is annexed hereto as Exhibit "A."

156.    As a result of employing expired paint, almost immediately upon the DODs receipt of the helmets, the paint on the exterior of the delivered helmets began to peel, crack and/or flake off.

157.    As a result, the DOD notified the defendants of such defective condition, and the defendants promised to remedy the conditions.

158.    The defendants submitted a proposal to the DOD to remedy the defects by **hand sanding** the entire surface of each helmet, by hand, first with a 180 grit sandpaper, and thereafter with a 320 grit sandpaper, and then to repaint them.

159.    Since the sanding of the helmets by hand and using the approved grades of sand paper would not the adversely affect, or weaken, the integrity of the outer shell of the helmets, the DOD approved of this hand sanding procedure to correct the paint defects.

160.    Once the DOD gave the defendants permission to correct the paint defects in this manner, however, the defendants did not remedy the defects as promised to the DOD.

161.    Instead, the defendants caused the staff at the factory to employ hand grinders and metal objects which they repeatedly struck against the outer shell of the helmets to chip off the defective paint. True copies of photographs of the metal objects employed by the workers to strike the paint off of the helmets in the factory are annexed hereto as Exhibit "B."

162.    As was known to the defendants, the DOD would never have approved the method of removing paint by using hand grinders and metal objects to repeatedly strike the helmets, as repeatedly striking the helmets with such hard objects weakens the structural integrity of the helmets' outer shell and does not adequately remedy the problems caused by the defendants' use of expired paint.

163.    During the period while such "corrective action" was being undertaken by the defendants, representatives of the DOD visited the factory to ensure that the proper remedying procedure was being employed.

164.    Having been made aware of the DOD's visit in advance, the defendants collected all of the hand grinders and metal objects, placed them into a bucket, and hid them in a closet.

165.    Then, for the sole purpose of misleading representatives of the DOD, the defendants set-up a fake factory line of factory workers who were hand-sanding helmets, as one of several false displays they had set-up to mislead representatives of the DOD.

166.    After Relator Melessa Ponzio confronted defendant Gary Vann about the

defendants setting up this false display to show representatives of the DOD, defendant Vann

explicitly advised Ms. Ponzio, "That is what they told me to do. Today is just a dog and pony

show."

167.    After DOD representatives inspected the factory and left, the defendants caused

the factory workers to take the hand grinders and metal objects back out of the closet and to

resume chipping the defective paint by repeatedly striking the helmets with the metal objects,

thereby reducing the structural integrity of the helmets. Several weeks later, Relator Sharon

Clubb observed the inmates using mini hatchets to chip the paint off of the helmets.

168.    As Plastics Worker Supervisor within the factory, Relator Sharon Clubb raised

objection to such actions on the part of the defendants, reduced such objections to writing, and

provided a copy of such writing to defendants Rick Carter and Reggie Wright, Harlan Hadaway

and Cynthia White, all of whom ignored her objections, and, together with the other defendants,

caused the factory workers to proceed in striking the helmets with metal objects to remove the

defendant paint which the defendants had previously applied to the helmets. True copies of

photographs of the mini hatchets which were used to chip off the paint are annexed hereto as

Exhibit "C," and a true copy of Relator Clubb's written objection is annexed hereto as Exhibit

"D."

D     The Shipment of Rejected Helmets

169.     Through each step within the process of manufacturing helmets for the DOD, the
defendants were required to maintain quality assurance control and to reject from any stage of the
factory's production line all helmets which failed to conform to specific standards set by military
specifications and the DOD.

170.     Among the persons assigned to quality control with the factory was federal inmate
Buddy Gunn, Reg. No 11525-080, who worked within the area supervised by Relator Melessa
Ponzio.

171.     On numerous occasions Mr. Gunn advised Ms. Ponzio that there were many
rejects on the production line, but that he was afraid to pull them for fear of being "fired" by
defendant Troy Miler.

172.     Mr. Gunn advised Relator Ponzio that defendant Miller told Mr. Gunn, "We don't
have rejects."

173.     After Relator Ponzio instructed Mr. Gunn to pull every defective helmet out of the
production line, Mr. Gunn pulled several hundred defective helmets from the line on August 1,
2009.

174.     Thereafter, defendants Troy Miller and Rick Carter placed the rejected helmets
back in the production line and saw to it that the defective helmets were both completed and,
thereafter, shipped to the DOD.

175.    When persons within the factory recorded the specific serial number of each of the defective helmets which had been removed from the production line, defendants Miller and Carter (acting with the acquiescence of defendants Mark Turner and Brad Beus), would change the serial numbers on the rejected helmets, and then place them back into production, so that the defective helmets could be completed and shipped to the DOD.

176.    After tiring of having to change serial numbers before putting defective helmets back into the production line, defendant Miller explicitly threatened the factory workers that he would fire any inmate that boxed up (set aside) defective helmets.

177.    After Relator Ponzio viewed a cart of helmets from the production line and saw that over half of the helmets were rejects, she directed the workers to reject defective helmets notwithstanding defendant Miller's threats.

178.    Thereafter, in a single day, factory workers rejected 150 helmets for "blisters" alone.  As a result, defendant Miller fired factory worker Brandon Henderson, registration number 03254-078, for removing defective helmets from the production line.

E    The Adulteration of Serial Numbers

179.    Because the DOD has classified ACH and LCH helmets as "critical safety items," the DOD's military specifications explicitly require strict traceability of all raw materials which are utilized to manufacture such helmets.

180.    To comply with such traceability requirements, the defendants were required to ensure that each and every helmet is registered with a unique serial number which attaches to each helmet at the moment a full set of *Kevlar* disks is weighed and prepared for installation into a specific helmet.

181.    From that moment on, it is critical that such specific serial number remain attached to that respective helmet through the rest of the manufacturing process and upon shipment.

182.    By having that unique serial number, the DOD can trace each and every element of raw material contained within that helmet, and it can also trace the manufacturing process through which that helmet was produced.

183.    As required under the DOD's specification, each helmet goes through a multitude of tests at various points throughout the manufacturing process.

184.    If a helmet fails a test at any point in the process, it is supposed to be rejected, and a record of the failed test is recorded together with the helmet's serial number.

185.    But as described herein, when the helmets being manufactured for the Rabintex

Defendants failed one or more tests during the manufacturing process, and concomitantly were

removed as rejects, the defendants would cause persons within the facility to place them back

into the production line and would further make sure they were ultimately shipped and sold to the

DOD.

186.    As actually carried out, to the extent that helmets were pulled out of production as

rejects, they were separated from the non-rejects by being placed in a box or cage.

187.    The pulling of rejects was done during ordinary business hours when the factory

was in operation.

188.    To get the rejected helmets back into production, the Rabintex defendants would

cause one of the other defendants, who actually worked in the Beaumont facility, to send in

inmates, during the weekend, to physically place the rejected helmets either back into the

production line, or in boxes which were about to be shipped to the DOD.

189.    The only problem for the defendants was that each of the rejected helmets had a

specific serial number, and when any of them had been rejected, a worker within the factory had

recorded that helmet's serial number as a reject on the factory's computer system.

190.    As such, anyone who checked for that helmet on the computer system would

know it was a reject.

191.    To conceal the fact that these helmets were rejects, the defendants simply caused

the "weekend workers" to remove the original serial numbers, and to place "new" serial numbers

on the previously rejected helmets.

192.    Annexed hereto as Exhibit "E" are handwritten sheets within which one or more

of the defendants listed the double numbers, that being the original serial number, and the "new"

serial number with which the defendants had replaced the genuine serial number.

193.    While false records within the factory indicate that the rejected helmets were

destroyed or "crushed," the handwritten records reflect that, in actuality, the reject helmets were

not crushed but were, in actuality, shipped to the DOD albeit with different serial numbers.

F.    Providing False Certifications to the DOD

194.    Despite repeated objections by the Relators to their supervisors, the defendants

deliberately defrauded the DOD through a wide range of intentional efforts.

195.    By way of example, the defendants staged false "dog and pony shows" on

occasions when they knew representatives from the DOD were going to visit the facility, where

the defendants set-up a false production line which made it appear that the defendants were

complying with DOD specifications and requirements, only to cease the charade once the DOD

representatives left.

196.    In a similar vein, on multiple occasions during which the DOD requested that the

defendants provide the DOD with "random samples" from each lot of helmets for testing, the

defendants "hand picked" helmets for inspection, or specially manufactured helmets which were

designed solely to pass the very test they knew the DOD intended to perform upon the helmets.

197.    Despite constantly threatening factory workers that they would be fired if they rejected any helmets, some helmets manufactured by the defendants were of such poor quality that even the prison inmates that were employed at the factory refused to let them pass inspection.

198.    Not only did the defendants cause those defective helmets to be sold to the DOD, over the repeated objections of the Relators (*See* Exhibit "F"), but the defendants submitted and caused to be submitted false certifications to induce the DOD to pay the defendants for such defective helmets.

199.    With each and every shipment of defective helmets, the defendants submitted or caused to be submitted a false certification, wherein one of the defendants certified that the manufacture of the helmets within that respective shipment had been performed under that person's respective supervision, and that each of the helmets contained within that respective shipment conformed with the terms of the contract.

200.    Each and every one of such certifications was false, because none of the shipments contained helmets which conformed with the requirements of the respective contract identified within each respective certification.

201.    Annexed hereto collectively as Exhibit "G," are true copies of false certifications dating from October 16, 2008 through July 16, 2009, within each of which the defendants falsely certified, and caused to be falsely certified, that the helmets described within each respective shipment were manufactured in accord with the contract specifically identified within each certification.

202. Those false certifications were submitted to the government, and presented to the government, by their submission to the respective receiving facilities listed upon each respective certification.

203. The defendants knowingly submitted and/or caused the submission of such false certifications to induce the DOD and the federal government to pay for the helmets shipped together with each false certification.

G. Payments

204. Each of the defendants presented and/or caused to be presented both false and fraudulent statements to the DOD to induce the DOD to make payments to the Rabintex defendants for the helmets described herein.

205. Each of the defendants presented and/or caused to be presented both false and fraudulent claims for payment to the DOD to induce the DOD to make payments to Rabintex for the defendant helmets described herein.

206. The false statements included, but were not limited to, the false certifications annexed hereto as Exhibit "G."

207. As a result of the defendants' submission of false statements and claims, the DOD was induced to pay Rabintex and the Rabintex defendants monies equaling or exceeding $26,012,238.00

208. As a result of the foregoing, the United States has been damaged in amounts equaling or exceeding $26,012,238.00.

## VI.     The Global Recall

209.    After the Plaintiff/Relators raised repeated objections to their superiors at Unicor, and such objections were ignored, the Plaintiff/Relators voluntarily reported the matter directly to the Office of the Inspector General for the United States Department of Justice.

210.    During several meeting with the representatives of the Office of the Inspector General (OIG), the Plaintiffs/Relators provided that office with **thousands** of pages of records to substantiate the factual claims they have detailed within this complaint.

211.    As a direct result of the information which the Relators had provided, and upon confirmation of same, the OIG precipitated a global recall of all ACH and LCH helmets which Rabintex and Armorsource had sold to the DOD, and for which the DOD had paid Rabintex and Armorsource over twenty-six million dollars ($26,000,000.00).

## VII.    The Conduct of The Defendants

212.    Upon information and belief, each and every one of the defendants: (a) presented and/or caused to be presented false and fraudulent claims to the U.S. Government; (b) made and used, or caused to be made and used, false records and statements to cause such false and fraudulent claims to be paid or allowed by the U.S. Government; and (c) conspired with the other defendants and/or third persons to get such false claims allowed or paid by the U.S. Government, within the meaning of 31 U.S.C. §3729.

213.    Upon information and belief, each and every one of the defendants herein caused, and/or conspired to cause, and did cause the Beaumont facility to manufacture defective helmets for sale to the DOD, to deliberately conceal the existence of such defects from the DOD, and to induce the DOD to purchase such defective helmets while being unaware of the deliberately concealed defects.

214.    Upon information and belief, each of the defendants further conspired to employ defective materials and defective manufacturing processes in the manufacture of such helmets, and to conceal same from the DOD.

215.    Upon information and belief, each and every one of the defendants caused the defective helmets to be shipped and/or delivered to the U.S. Government.

216.    Upon information and belief, each and every one of the defendants knew that the defective helmets were shipped and/or were to be shipped to the U.S. Government for the purpose of inducing the U.S. Government to pay the Rabintex Defendants for the purchase of same.

217.    Upon information and belief, each of the defendants presented or caused to be presented to the U.S. Government, packlist/invoices seeking payment for the defective helmets described herein, thereby presenting or causing to be presented, false and/or fraudulent claims for payment or approval, within the purview of 31 U.S.C. §3729(a).

218.    Upon information and belief, each of the defendants made, used or caused to be made or used, false records and statements, and thereby made, used, or caused to be made or used a false record and statement for the purpose of having such false and/or fraudulent claims paid.

219.    Upon information and belief, each of the defendants caused the creation of the false certifications which were submitted to the U.S. Government to induce approval and payment of the false and fraudulent claims, and thereby made, used and/or caused to be made or used false records and statements to induce payment of such false and fraudulent claims by the U.S. Government, within the purview of 31 U.S.C. §3729(a)(1)(B).

220.    Upon information and belief, each of the defendants recognized that each respective invoice which they caused to be presented to the U.S. Government constituted a representation that the defendants had delivered goods which conformed to the requirements of the Rabintex Defendants' contracts with the U.S. Government, and the applicable U.S. military specifications which governed same.

221.    Upon information and belief, each and every one of the defendants knew such information to be false.

222.    Pleading in the alternative, to the extent that any of the defendants lacked actual knowledge of the falsity of the information provided to the U.S. Government, each such defendant acted in deliberate ignorance of the truth or falsity of the information and/or acted in reckless disregard of the truth or falsity of the information.

223.    Upon information and belief, each of the defendants knowingly and deliberately failed to disclose to the U.S. Government the fact that the goods shipped and delivered to the U.S. Government were inherently defective and were not manufactured to meet the minimum specifications which had been required by the U.S. Government.

224.   That, by virtue of the defendants' conspiracy and their affirmative actions in furtherance of such conspiracy, and fraudulent actions and efforts, the defendants fraudulently induced the U.S. Government to tender sums equaling or exceeding twenty-six million dollars ($26,000,000.00) for the inherently defective helmets which the defendants knowingly manufactured and delivered to the U.S. Government.

225.   That the defendants named herein as John Does are believed to be individual principals and/or agents of Rabintex Industries LTD. whom, upon information and belief, supervised, controlled, and caused, the actions described herein above, including, but not limited to, the employ of defective materials and defective manufacturing processes, the ultimate sale of the defective helmets to the DOD, and the submission of false certifications to the DOD to induce the federal government to pay for the purchase of such defective helmets as described herein. That at least two of such John Does, whose partial names are believed to be Yani and Jacob, physically visited the Beaumont facility and directed the actions described herein.

## COUNT ONE
## FALSE CLAIMS ACT - 31 U.S.C. §3729(a)(1)(A) and (B)

226.    The plaintiffs repeat, reiterate and incorporate by reference all of the allegations contained in paragraphs "1" through "225" hereinabove, as if fully set forth at length herein.

227.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §3729 et seq., as amended.

228.    The Plaintiffs/Relators, Melessa Ponzio and Sharon Clubb have standing to maintain this action by virtue of 31 U.S.C. §3730(b) and (h).

229.    By virtue of the acts described herein above, each of the defendants herein knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States Government, and knowingly failed to disclose material facts, in order to induce the Government to make payment or approval of such false or fraudulent claims.

230.    By virtue of the acts described above, each of the defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to induce the Government to pay or approve false and fraudulent claims.

231.    By reason of these payments or approvals, the United States has been damaged, and continues to be damaged, in amounts equaling or exceeding twenty-six million dollars ($26,000,000.00).

232.    By virtue of the foregoing, each and every one of the defendants are liable for such damages, and the other claims set forth herein, under 31 U.S.C. §3729.

## COUNT TWO
### FALSE CLAIMS ACT - 31 U.S.C. §3729(a)(1)(C)

233.    The plaintiffs repeat, reiterate and incorporate by reference all of the allegations

contained in paragraphs "1" through "232" herein above, as if fully set forth at length herein.

234.    This is a claim for treble damages and forfeitures under the False Claims Act, 31

U.S.C. §3729 et seq., as amended.

235.    By virtue of the acts described herein above, each of the defendants herein

conspired with others to defraud the United States by inducing the Government to pay or approve

false or fraudulent claims.  Defendants, moreover, took substantial steps in furtherance of the

conspiracy, inter alia, by making fraudulent representations, by preparing fraudulent records and

by failing to disclose material facts.

236.    As a result of such conspiracy, the United States was caused to pay, and has been

damaged, and continues to be damaged, in amounts equaling or exceeding twenty-six million

dollars ($26,000,000.00).

237.    By virtue of the foregoing, each and every one of the defendants are liable for

such damages, and the other claims set forth herein, under 31 U.S.C. §3729.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs/Relators pray for judgment against the defendants, jointly and severally, for each of the claims set forth above, as follows:

### COUNT ONE

### FALSE CLAIMS ACT - 31 U.S.C. §3729(a)(1)(A) and (B)

By reason of the Defendants' violations of the Federal False Claims Act, the Plaintiffs/Relators respectfully demands that this Court:

(a)     enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. §3729, and

(b)     award the Relators, as *qui tam* Plaintiffs, the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act, and/or any other applicable provision of law, and that the Relator further be awarded costs and reasonable attorney's fees pursuant to Section 3730(d).

## COUNT TWO

## <u>FALSE CLAIMS ACT - 31 U.S.C. §3729(a)(1)(C)</u>

By reason of the Defendants' violations of the Federal False Claims Act, the Plaintiffs/Relators respectfully demands that this Court:

(a)     enter judgment against the Defendants in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions, plus civil penalties of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. §3729, and

(b)     award the Relators, as *qui tam* Plaintiffs, the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act, and/or any other applicable provision of law, and that the Relator further be awarded costs and reasonable attorney's fees pursuant to Section 3730(d).

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the plaintiffs hereby demand a trial by Jury.

Dated:  September 21,  2010

Cliff Johnson (admitted *pro hac vice*)
Brad Pigott
Pigott Reeves Johnson, P.A.
775 N. Congress Street
Post Office Box 22725
Jackson, Mississippi 39225-2725
Telephone:  (601) 354-2121
Facsimile: (601) 354-7854

Andrew J. Campanelli (AC 4014)
Campanelli & Associates, P.C.
623 Stewart Avenue, Suite 203
Garden City, NY 11530
Telephone      (516) 746-1600
Facsimile      (516) 746-2611
E-mail          ajc@campanellipc.com

ATTORNEYS FOR RELATORS
MELESSA PONZIO and
SHARON CLUBB

## VERIFICATION

STATE OF TEXAS     )
                       ) ss.:
COUNTY OF JEFFERSON  )

       MELESSA PONZIO, being duly sworn, deposes and says:

    1.    That I am one of the plaintiffs in the within action.

    2.    That I have read the foregoing COMPLAINT and know the contents thereof; the

same is true to deponent's own knowledge, except as to those matters said to be upon information

and belief, and as to those matters, deponent believes it to be true.



                                   MELESSA PONZIO

Sworn to before me on this
21th day of September, 2010

Notary Public

ROXANA SANDOVAL
Notary Public
STATE OF TEXAS
My Comm. Exp. April 22, 2013

Filed Under Seal   - 45'-   Filed Under Seal